[Nos. 26878-3-I; 27071-1-I;   Division One.   August 24, 1992.] 27096-6-I.

*In the Matter of the Marriage of* PEGGY H. FORAN, *Respondent, and* JAMES E. FORAN, *Appellant.*

244

*Martin A. Godsil* and *Casey & Pruzan,* for appellant.

*Paul F. Blauert, Kenneth G. Christensen, Roger E. Rahlfs,* and *Robben & Blauert; Rynold C. Fleck* and *Fleck Law Offices,* for respondent.

KENNEDY, J. — The marriage of James and Peggy Foran was dissolved by decree of the court in August 1990. James contends that the court erred by determining that the parties' prenuptial contract was unenforceable. He further contends that the court erroneously based its property, main-

tenance and attorney fee awards on marital fault.[1] We conclude that the prenuptial contract was void from its inception. The court did not err by considering the effect that the physical and emotional abuse inflicted upon Peggy during the relationship had upon her economic circumstances. Accordingly, we affirm.

## FACTS

James Foran and Peggy Estes first became acquainted in 1975 when Peggy was 22 and James was in his mid-forties. When they began living together a year later, Peggy was working at Jay Jacobs. She terminated her employment there, at James' request, because it involved working weekends, and took a job as a teller at Seafirst Bank. In April 1977, James reactivated one of his businesses, Jim Foran Trucking, Inc., and Peggy began working for that company as a dispatcher and bookkeeper, while continuing to work for the bank. In November 1977, Peggy terminated her employment at the bank in order to work full time for Jim Foran Trucking, Inc.

The parties were married in Las Vegas on January 17, 1980. On January 11, 1980, 1 day before the parties left for their wedding trip, they signed a prenuptial contract. Peggy first saw the contract on January 10, although she had known that such an agreement was being prepared since late December 1979. The contract was prepared by James' business attorney, Jeffrey Pewe, at James' request. Peggy had worked with Mr. Pewe on various matters related to James' business affairs during her employment at Jim Foran Trucking, Inc. As a result, she had grown to trust Mr. Pewe and to respect him.

---

[1]James also argues that Peggy received far too much by way of property, maintenance and attorney fees. In her cross appeal, Peggy contends that the court's property, maintenance and attorney fee awards were so inadequate as to constitute an abuse of discretion. Each party argues that the court erred in valuing and characterizing certain assets. We conclude that the property division was fair and equitable in all the circumstances. The maintenance and attorney fee awards were well within the bounds of the court's discretion. The issues not related to the validity of the prenuptial contract and to the evidence of physical abuse are treated in the unpublished portion of this opinion.

Mr. Pewe informed Peggy that he was representing James, and only James, with respect to the prenuptial contract. He informed Peggy that she should obtain independent counsel. Peggy did not do so. She testified that she was under a great deal of pressure in the days leading up to the execution of the contract, as the result of preparing for the wedding trip and because of matters involving the trucking business, including a potential lawsuit over the purchase of a truck.

Unbeknownst to Mr. Pewe, there had been several episodes of domestic violence during the 3½ years the parties had cohabited. The episodes had occurred at about 1-year intervals. Each was followed by profuse apologies from James and by promises that it would never happen again. Peggy testified that James told her that she would be signing a paper before they got married. She testified that she knew she would be hit if she did not sign the paper.

Peggy also testified that, after meeting with Mr. Pewe, she believed this was an agreement that would provide a community estate:

> My understanding of it was that it was supposed to create a community estate so that while I was working in the business and everything, it was building a community; it was a legal agreement that what we were building, we were building together.

Instead, the contract, by its terms, gave James the opportunity either to preclude altogether or substantially restrict the accumulation of community property. Moreover, the contract enabled James to enrich his separate estate at the expense of the marital community. James took full advantage of these opportunities.

At the time the agreement was signed, Peggy's net worth was $8,200. James' net worth was $1,198,500.

Peggy continued to work for Jim Foran Trucking, Inc., throughout the marriage, as did James. Purportedly for tax reasons, neither party received much by way of salary. In some years neither party received any salary at all. The parties' living expenses were paid primarily from James'

separate resources. By 1987 the parties had acquired no significant community property. Indeed, there had been no significant community income with which to acquire community assets. Beginning in 1987, the parties put a great deal of time, labor and effort into developing a tract of unimproved property, which was part of James' separate estate, into a gravel pit and dump site. In January 1989, the parties separated.

During the marriage, the episodes of domestic violence escalated, both in frequency and severity. By the time of the separation, Peggy, who also suffers from lupus, was in need of treatment for posttraumatic stress disorder stemming from the severe physical and emotional abuse she endured throughout the marriage. She was last employed in January 1989, in the operation of the gravel pit and dump site and for the trucking company, and had been unemployed and in therapy from then until the trial in June 1990. Her lupus had earlier flared up, requiring hospitalization, but by the time of trial was being controlled with medications.

Peggy's therapist testified that Peggy was in need of at least 2 more years of intensive psychotherapy, and perhaps as much as 5 more years of such therapy. Her lupus will require continuous monitoring, at least monthly, for the remainder of her life, and can be expected to flare up periodically, in spite of the medications she is on. Peggy's medical and psychological care required approximately $1,000 per month as of the time of trial. Peggy's therapist testified that she is likely to become employable again, although she should not make that effort until she experiences further progress in the psychotherapy. Peggy had commenced a program of vocational planning prior to trial but had been unable to fully concentrate on that program, due to her need to concentrate on regaining her emotional equilibrium.

James had also been hospitalized, prior to separation, for a colostomy operation. He had not completed all the necessary surgery by the time of trial. The court found James to have an earning capacity of $50,000 a year, a finding which James disputes.

248

## Discussion
### Prenuptial Contract

The trial court concluded that the prenuptial contract was valid at the time it was executed and that Peggy signed it voluntarily and after an adequate opportunity to seek the advice of independent counsel. The court also found that Peggy was aware of the nature and extent of James' separate property. The court concluded, however, that it would be inequitable to enforce the contract in light of James' conduct toward Peggy after the marriage.[2] The court therefore ruled that James was estopped[3] from relying upon the prenuptial agreement to preclude Peggy from making a claim against his separate assets, in order to equitably balance the economic circumstances of the parties as provided in RCW 26.09.080.

■ We disagree with the trial court's determination that the agreement was valid at the time of execution, but affirm its conclusion that the prenuptial agreement was unenforceable. A trial court's decision may be sustained on any theory within the pleadings and the evidence, even if the trial court did not consider it. *LaMon v. Butler*, 112 Wn.2d 193, 201, 770 P.2d 1027, *cert. denied*, 493 U.S. 814, 107 L. Ed. 2d 29, 110 S. Ct. 61 (1989); *In re Marriage of Sanchez*, 33 Wn. App. 215, 217, 654 P.2d 702 (1982).

---

[2] Based on the court's oral decision, we believe that the court was referring to James' conduct in preventing the accumulation of community property, rather than to his physical and emotional abuse of Peggy.

[3] James correctly points out that an equitable estoppel theory is not supported by the evidence or findings. To assert equitable estoppel, each of the following elements must be established by clear, cogent and convincing evidence: (1) an admission, statement or act by the party against whom estoppel is asserted inconsistent with a later claim by that party; (2) action by the party asserting estoppel on the faith of such admission, statement or act; and (3) injury resulting from allowing the repudiation of such admission, statement or act. *In re Marriage of Sanborn*, 55 Wn. App. 124, 129, 777 P.2d 4 (1989). That the trial court invoked the notion of estoppel without making any specific findings as to the manner in which the facts before it met each of the required elements suggests that the trial court was simply using the language of estoppel to express a more general conclusion that enforcing the prenuptial agreement was inequitable. *See In re Marriage of Matson*, 107 Wn.2d 479, 488, 730 P.2d 668 (1986) (Pearson, J., concurring).

■ The validity of a prenuptial agreement is evaluated by means of a 2-prong analysis:

> First, the court must decide whether the agreement provides a fair and reasonable provision for the party not seeking enforcement of the agreement. If the court makes this finding, then the analysis ends and the agreement may be validated. . . .
> The second prong of this analysis involves two tests . . .
> (1) whether full disclosure has been made by [the parties] of the amount, character and value of the property involved, and (2) whether the agreement was entered into fully and voluntarily on independent advice and with full knowledge by [both spouses of their] rights.

*In re Marriage of Matson*, 107 Wn.2d 479, 482-83, 730 P.2d 668 (1986) (quoting *Whitney v. Seattle-First Nat'l Bank*, 90 Wn.2d 105, 110, 579 P.2d 937 (1978)).

■ Here, although the record does not affirmatively so state, we assume that the trial court decided that the contract failed to pass the first prong of the 2-part analysis.[4] Indeed, this contract fails the first part of the test as a matter of law. In the instant matter there is no issue as to the "interpretation" of the contract; rather the issue is one of "construction":

> Construction of a contract determines its legal effect. "Construction . . . is a process by which legal consequences are made to follow from the terms of the contract and its more or less immediate context, and from a legal policy or policies that are applicable to the situation."

*Berg v. Hudesman*, 115 Wn.2d 657, 663, 801 P.2d 222 (1990) (quoting Patterson, *The Interpretation and Construction of Contracts*, 64 Colum. L. Rev. 833, 835 (1964)); *see also* 3 A. Corbin, *Contracts* § 534 (1960 & Supp. 1990).

■ By the terms of this contract, Peggy waived any and all equitable liens which the marital community might otherwise acquire by virtue of the expenditure of community funds or community labor on or for the benefit of

---

[4]We make this assumption because the court focused almost entirely on the second prong of the analysis, that designed to ascertain procedural fairness. Had the court concluded that the contract was economically fair on its face, the analysis would have ended. *Matson*, 107 Wn.2d at 482.

James' separate estate. Peggy also waived all of her statutory rights as a surviving spouse in the event that James should predecease her. She also waived any right to make a claim against James' separate estate in the event of a marital dissolution. Although James made reciprocal promises, as noted by the trial court,

> [i]n this case, [Peggy] had negligible separate property at the time the parties executed their prenuptial agreement. . . . [James] had a great deal of separate property. It was insignificant for [James] to promise not to invade [Peggy's] separate property; it was a significant promise for [Peggy] to make the same promise.

Finding of fact 8.[5]

There was no contractual requirement that the marital community be reimbursed for the value of any financial contributions and personal services it might contribute to James' separately owned businesses.[6] The lack of such a provision, in conjunction with the waivers as to any equitable liens which might otherwise arise by virtue of community funds and services expended on or for the benefit of James' separate estate, allowed James effectively to foreclose the accumulation of any significant community estate.

---

[5]The stated consideration for the contract was the mutual promises of the parties and the marriage itself. In Washington, marriage alone is adequate consideration to support a prenuptial contract. *Friedlander v. Friedlander*, 80 Wn.2d 293, 300, 494 P.2d 208 (1972). *But see Hamlin v. Merlino*, 44 Wn.2d 851, 864-65, 272 P.2d 125 (1954) (suggesting that the adequacy of the consideration is determined by the economic fairness of the contract).

[6]Mr. Pewe clearly recognized that the contract made no such provision, and that there was the potential for attack upon the enforceability of the contract for that reason. In a letter addressed to James Foran, dated and delivered on the same day as the prenuptial contract was signed, Mr. Pewe told Mr. Foran:

> With respect to your corporation, there is one unique problem of which I want you to be aware. Your earnings in the employ of the corporation after your marriage will be community property. If you do not take an adequate salary, an argument can be made that the salary which you should have taken during your marriage has built up in the corporation and the community therefore has an ownership interest in the corporation. Likewise, pay yourself an adequate salary for providing services to the Jim Foran Company.

Respondent's trial exhibit 178.

The contract, while not affirmatively precluding the acquisition of community property, certainly allowed for that result, and, were the contract allowed to stand, such would have been the result in this case. Peggy's own separate estate was insignificant and the contract also made no provision for Peggy, from James' separate estate, in the event of divorce or in the event of James' death during the marriage. Accordingly, for all of these reasons, the contract fails the test of economic fairness and we must "zealously and scrupulously" examine the circumstances leading up to its execution, with an eye to procedural fairness. *Matson*, 107 Wn.2d at 486.

■ Although we find no discussion in the case law as to the standard of review for the second prong of the *Matson* test,[7] both in terms of logic and as consistently applied by the appellate courts since *Hamlin v. Merlino* in 1954,[8] the analysis involves mixed issues of legal policy and fact, and accordingly is treated as a question of law, but one to be viewed in the light of those findings of the trial court which are undisputed or supported by substantial evidence and which in turn support the trial court's ultimate conclusion.[9] For example, in *Matson*, as in the instant matter, the trial court found that Judith Matson had been advised of her right to seek independent legal counsel, and that finding was undisputed. Nevertheless, the *Matson* contract was invalidated, based on an overriding legal policy that disfavors the waiver of marital rights without the benefit of

---

[7]The first part of the 2-prong analysis is entirely a question of law, unless there are factual disputes which must be resolved in order to enable the court to interpret the meaning of the contract. *Berg v. Hudesman*, 115 Wn.2d at 668. There are no such factual disputes here.

[8]*Hamlin v. Merlino*, 44 Wn.2d 851, 272 P.2d 125 (1954). Although we refer to the 2-prong analysis as the "*Matson* test", *Matson* represents the culmination of 30 years of judicial refinement of the test first developed in *Hamlin v. Merlino, supra*.

[9]Judicial construction of a contract is a process which includes an examination of the immediate context and the legal policies which are applicable to the situation. *Berg v. Hudesman*, 115 Wn.2d at 663.

independent legal advice. *Matson,* 107 Wn.2d at 488. Here, the trial court found that Mr. Pewe "took extraordinary steps to assure that [Peggy] would know that he was looking out for [James'] interest and that she should have independent counsel." Finding of fact 7. We must determine whether this undisputed finding supports the trial court's legal conclusion that the contract was valid when executed, based on the second prong of the *Matson* analysis.

In addition to the letter which Mr. Pewe addressed and delivered to James Foran, another letter was addressed and delivered to both parties on the same day that the prenuptial contract was executed, in which Mr. Pewe outlined the general law relating to separate and community property. In the letter Mr. Pewe stated:

> One of the purposes of a separate property agreement (known variously as pre-nuptial agreements, pre-marital agreements and agreements as to status of property) is to insure that, by reason of the agreement, a court will not be able to award the separate property of one spouse to the other spouse in the event that the parties' marriage is subsequently dissolved. In other words, a court can award the separate property of one spouse to the other in a divorce action, unless the parties have agreed by contract that they shall not be entitled to claim the separate property of the other in the event of a dissolution.
>
> . . . .
> . . . Ms. Estes should be aware that I am Jim's attorney and have drafted the Agreement with his legal and financial interests in mind, rather than hers. Understandably, I cannot serve two masters. Therefore, if after reviewing the proposed agreement and this letter, Ms. Estes has further questions regarding her rights and the legal import and effect of the various provisions in the Agreement, she should seek the counsel of another attorney to review the contract on her behalf.
>
> If, notwithstanding her right to seek the counsel of another attorney regarding the Agreement, Ms. Estes elects to execute the agreement without doing so, I want to make it clear in the Agreement that . . . the opportunity to seek independent counsel was made available to her, but was voluntarily not exercised by her.

Exhibit C to prenuptial contract, trial exhibit 151.[10]

---

[10]The record reflects that Mr. Pewe was not aware that the parties were planning to leave for their wedding trip on the following day, January 12, 1980, nor was he aware of the date of the parties' wedding (January 17, 1980). It should also be noted that Mr. Pewe was operating without the benefit of *Matson,*

■ Mr. Pewe clearly advised Peggy that she should seek independent legal counsel. What is missing from the picture, however, is any explanation of why that was so important. In another context, our Supreme Court has recently discussed the obligation of attorneys toward unrepresented persons with whom the attorney's client is doing business.

> Attorneys have a duty of zealously representing their clients within the bounds of the law. When their clients have opposing interests with third parties, attorneys are supposed to represent their clients' interests over the interests of others.
>
> . . . [A]n attorney should advise the unrepresented party to seek independent counsel before the attorney discusses the transaction with that party. It was not enough in this case that Cody told Bohn that he was not acting as her attorney. This information does not sufficiently convey to the general public the adversarial stance an attorney must take toward those having interests different from the client's own interests. *Moreover, if the attorney undertakes to tell part of the story to an unrepresented party with whom the attorney's client is doing business, the attorney must take reasonable steps to tell the whole story, not just the self-serving portions of it.*

(Italics ours.) *Bohn v. Cody*, 119 Wn.2d 357, 367, 832 P.2d 71 (1992).

■ In the instant matter, Mr. Pewe found himself in a position that is all too familiar to attorneys who work with prenuptial contracts. The economically disadvantaged party may not only be reluctant to obtain independent legal counsel but also he or she may decline to do so, even after being advised to do so by the attorney for the represented party. It was so in this case. It was so in *Matson*.[11] An attorney in this

---

which was not handed down until December 31, 1986. Clearly, under *Matson*, Peggy did not have sufficient time to consult with independent counsel. She first saw the contract on January 10. She signed the contract on January 11, 1 day before the parties embarked on their wedding trip. Even if Peggy had seen an attorney on January 10 or 11, there would not have been sufficient time to negotiate an economically fair contract before the January 12 departure. The only realistic choice would have been to postpone the wedding or to negotiate and enter into the contract after the wedding. Most attorneys would so advise both Peggy and James, if the same contract were being proposed today.

[11]*See also In re Marriage of Hadley*, 88 Wn.2d 649, 565 P.2d 790 (1977) (wife retained independent legal counsel but failed to provide necessary information to enable attorney to properly advise her).

situation is presented with a number of choices. He or she may endeavor, if the client consents, to prepare a contract which is designed to meet the first prong of the *Matson* test, that of economic fairness for the economically subservient party.[12] Whether or not the client consents to the preparation of a contract which attempts to achieve economic fairness for the economically subservient party, the attorney should explain to that unrepresented party *why* it is so important that he or she seek the advice of independent counsel. That which is obvious to attorneys and judges may not be obvious to the unrepresented and economically subservient party. Every marriage eventually will terminate by one of two means: by marital dissolution or by the death of a spouse during marriage. What is indeed being sought is a divorce settlement and a death settlement.[13] The purpose of independent counsel is more than simply to explain just how unfair a given proposed contract may be; *it is for the primary purpose of assisting the subservient party to negotiate an economically fair contract.* The desire of the economically dominant party to preserve the bulk of his or her wealth, and for some reasonable degree of certainty in the event of divorce, is not necessarily entirely inconsistent with the goal of economic fairness for the disadvantaged party. It is not conducive to marital tranquility to ask a party who comes into the marriage destitute to leave the marriage equally

---

[12]We encourage this approach.

"Parties to [a prenuptial] agreement do not deal at arm's length with each other. Their relationship is one of mutual trust and confidence. They must exercise the highest degree of good faith, candor and sincerity in all matters bearing on the proposed agreement."

*Hamlin v. Merlino*, 44 Wn.2d at 864 (quoting Lindey, *Separation Agreements and Ante-Nuptial Contracts* (1953)); *see also Whitney v. Seattle-First Nat'l Bank*, 90 Wn.2d 105, 108, 579 P.2d 937 (1978); *In re Estate of Crawford*, 107 Wn.2d 493, 497, 730 P.2d 675 (1986).

[13]These simple truths may seem to be self-evident. Nevertheless, parties who would never agree to a divorce settlement or death settlement without the benefit of independent counsel frequently will fail to perceive the true nature and purpose of a prenuptial contract.

destitute, or worse, perhaps many years later, and perhaps at a time when age, health and forgone career opportunities dictate that he or she can no longer acquire assets by virtue of employment, to leave the marriage in a far worse position than if the marriage had never taken place. *Both* parties to a prenuptial contract need to understand the underlying premises which dictate the need for independent counsel.[14]

In this case of Foran, Peggy was handed a proposed contract which not only attempted to preserve James' separate estate but also left James with every opportunity to preclude the acquisition of community property and to enrich his separate estate at the expense of the marital community. James took that opportunity, and, if the contract were to be enforced, there would be virtually no community property in this case.[15] Although Mr. Pewe explained that the purpose of the contract was to preclude the court from awarding any of James' separate estate to Peggy in the event of a divorce, it was not explained to Peggy that, by virtue of the contract, James' already substantial wealth could be increased at the expense of the marital community. Although Mr. Pewe advised James to pay himself an adequate salary for his services to his businesses, and explained the risks of not following this advice *to James*, no explanation was given *Peggy* of the risks to her if the advice was not followed. Finally, although Peggy was advised of her right to seek

---

[14]In *Friedlander v. Friedlander*, 80 Wn.2d 293, 301, 494 P.2d 208 (1972) the court stated that a prenuptial contract freely and intelligently made is generally regarded as conducive to marital tranquility and the avoidance of disputes about property in the future. To the extent that the parties negotiate an economically fair contract, we fully agree. The same cannot be said of a contract which fails the first prong of the *Matson* test. An attorney who represents either party to a prenuptial contract should seriously consider the implications of RPC 2.1 (In rendering advice, a lawyer may refer not only to law but to other considerations such as moral, economic, social and political factors, that may be relevant to the client's situation.). A client is not well served by an unenforceable contract. Marital tranquility is not achieved by a contract which is economically unfair or achieved by unfair means.

[15]The record reflects that the parties acquired some furniture, their personal vehicles and two small IRA's. Even their personal vehicles were arguably James' separate property, by the terms of the prenuptial contract.

independent counsel, albeit too late, under *Matson*, there was no explanation of why this was important. In short, Mr. Pewe undertook to tell Peggy only part of the story, the part that served his client, and not the whole story. *Cf. Bohn v. Cody, supra.*[16]

In *Matson*, after observing that the requirement of independent counsel is not absolute, the court stated:

> We still strongly urge both parties to seek advice from independent counsel before signing a premarital agreement. This would provide the best opportunity for both sides to receive objective and independent information regarding the legal consequences of the agreement. Because of the close and confidential nature of the relationship of a soon to be married couple, we will continue to insist, however, that each party enter into a premarital agreement *intelligently and voluntarily* before we will bind the parties to an agreement by which one party forgoes its statutory and common law rights.

(Italics ours.) *Matson*, 107 Wn.2d at 488.

In the companion case of *In re Estate of Crawford*, 107 Wn.2d 493, 496-97, 730 P.2d 675 (1986), handed down on the same day as *Matson*, the court said:

> There is no absolute requirement of independent counsel. *Whitney*, at 111. *Whitney*, however, did not require the advice of independent counsel because the agreement was fair and reasonable, and there was no showing of fraud or overreaching. *Here the agreement was patently unreasonable. Independent counsel was required.*

(Italics ours.)

 That the Crawford prenuptial contract was patently unreasonable is something that Genevieve Crawford was ill equipped to determine on her own. Peggy Foran was similarly ill equipped to make that determination with respect to the contract in this case. We hold that the Foran contract, which placed no restrictions upon James' opportunity to

---

[16]We do not question Mr. Pewe's good faith. In fact, as noted by the trial court, Mr. Pewe made much greater effort than many, if not most, attorneys of that era were making in similar situations. As noted above, Mr. Pewe was working without the benefit of *Matson* and *Crawford*, which had not yet been decided when this contract was prepared.

preclude the acquisition of community property and to enrich his $1.2 million estate at the expense of the marital community, was patently unreasonable. Under the facts of this case we hold that, although Peggy's execution of the contract was in one sense "voluntary",[17] it was in no sense "intelligent", that is, there is not sufficient evidence from which we can conclude that Peggy fully understood the legal consequences of the contract. Finally, we hold that it was not sufficient, in order to meet the second prong of the *Matson* test, that Peggy was advised in general terms that the contract would limit the options of the divorce court and that she should obtain the advice of independent counsel. An appellate court will not enforce a *patently unfair* prenuptial contract unless it can reasonably conclude that an unrepresented party, who was not dealing at arm's length and whose relationship with the represented party was one of mutual trust and confidence, entered into the contract *with a full understanding of the legal consequences of the contract*. One who does not have that understanding has not "voluntarily and intelligently" entered into the contract as required by *Matson*. Here, Peggy could have "voluntarily and intelligently" entered into this contract only if she fully understood how economically unfair the contract was. There is no evidence that she did. Rather, the evidence is to the contrary. Peggy testified that she thought the contract would insulate James' separate estate but that it would ensure that what she and James built they would build together. There is no finding to the contrary and the evidence would not support any finding to the contrary. Moreover, it was not Peggy's burden to prove that she did not voluntarily and intelligently execute the contract. It was James' burden to prove that she did. *In re Estate of Crawford*, 107 Wn.2d at

---

[17]We agree with the trial court that the evidence of the premarital domestic violence was not sufficient to support a finding that Peggy's signature was coerced. Nevertheless, we recognize the potentially inhibiting effect of such violence on a subservient party's willingness to invoke the right of independent counsel.

496. This contract was void from the inception. We hold that the trial court did not err by refusing to enforce it.[18]

### ADMISSIBILITY OF TESTIMONY CONCERNING ABUSE

James contends that, by allowing testimony of the abuse Peggy endured during the course of the parties' relationship, the trial court erroneously considered fault in violation of RCW 26.09.080 and 26.09.090, which provide that a court shall make its disposition of property and maintenance in a dissolution proceeding without regard to marital misconduct.

The trial court considered the manner in which Peggy was treated during the relationship in relation to two issues: whether Peggy was coerced into signing the prenuptial agreement, and her present employability and prospective earning capacity, in light of the posttraumatic stress disorder from which she suffered as a result of the abuse. Evidence that reasonably tends to establish the theory of a party or to qualify or disprove the testimony of the adversary is relevant. *Brown v. Spokane Cy. Fire Protec. Dist. 1*, 100 Wn.2d 188, 199, 668 P.2d 571 (1983); ER 401. A trial court's ruling with respect to relevance will not be reversed absent a manifest abuse of its discretion. *Brown*, 100 Wn.2d at 199. Here, the testimony concerning abuse was properly admitted for purposes of applying the second prong of the *Matson* test (procedural fairness) in determining the validity of the prenuptial contract and in connection with Peggy's need for maintenance. Specifically, the testimony of abuse predating the marriage was relevant with respect to Peggy's contention that she signed the prenuptial agreement in part because she was afraid she would get hit if she did not do what James told her to do. The testimony of abuse during the marriage was relevant to substantiate the testimony of Diana DeWitt, Peggy's therapist, that Peggy's emotional and psychological condition at the time of trial was such that she could not support herself. In order to substantiate that a party suffers from posttraumatic stress disorder it

---

[18]In light of this ruling, we need not address the trial court's determination that a court may ignore a validly executed prenuptial contract if necessary to achieve a just and equitable result as required by RCW 26.09.080. *See Matson*, 107 Wn.2d at 488 (Pearson, J., concurring).

must be shown that something traumatic occurred to cause the disorder — in this case, years of physical and emotional abuse. There is no basis in this record for concluding that the trial court considered the evidence of abuse for any improper purpose. Moreover, in Washington, it is presumed that a trial judge knows the Rules of Evidence and that he or she considered only the evidence properly before the court and only for proper purposes. *In re Harbert*, 85 Wn.2d 719, 729, 538 P.2d 1212 (1975). We hold that the trial court did not err in admitting and considering the evidence of physical abuse with respect to the circumstances surrounding the execution of the contract and with respect to Peggy's need for spousal maintenance.[19]

Affirmed.

COLEMAN and AGID, JJ., concur.

---

[19]We summarily reject James' contention that Peggy's only remedy for her damages resulting from the physical abuse sounded in tort. RCW 26.09.090 permits the court to consider all factors which are relevant to the economic circumstances of the parties.