# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

In the Matter of the Marriage of )    NO. 67817-5-I
)
DORIS BERG, )
)    DIVISION ONE
         Respondent, )
)
    and )
)    UNPUBLISHED OPINION
LOUIS BERG, )
)
         Appellant. )    FILED: November 12, 2013
)

LEACH, C.J. — Lou Berg appeals the decree dissolving his marriage with Doris Berg.[1] He contends that the trial court erred by invalidating the parties' prenuptial agreement, by excluding untimely disclosed witnesses, by awarding Doris maintenance, and by denying his motion for reconsideration. Doris cross appeals, challenging the court's valuation of Lou's business assets. Both parties request attorney fees on appeal. Because substantial evidence supports the trial court's findings and the court did not abuse its discretion, we affirm.

## FACTS

Lou and Doris Berg married in March 1982. It was a second marriage for each. Less than two weeks before their wedding, Lou took Doris to meet with his

---

[1] We use the parties' first names for clarity.

attorney, Wolfgang Anderson, about a prenuptial agreement. Anderson told Doris to "look it over." Doris met with her parents' longtime attorney, Howard Pruzan, for a 30-minute consultation to review the document. Pruzan may have made some minor changes to the document.

The agreement purported to protect the parties' separate assets. It identified the assets each owned at the time they married. Doris owned a home on Mercer Island and an automobile; she had money in various bank accounts and retirement savings, two term life insurance policies, and some personal possessions. Excluding the insurance policies, which had no cash value, her assets totaled approximately $160,000. By contrast, the agreement described Lou's estimated net worth at over $350,000, including the value of his financial services business, two vacation homes, investment properties, and whole life insurance investments.

When they married, Doris and Lou had a significant earning differential that continued throughout the marriage. Doris worked as a speech therapist in the King County School District for more than 30 years. The district paid her about $60,000 the year before the dissolution proceedings began. Lou worked for Crown Finance, a financial services company that made high-interest "hard money" loans. Eventually, he became the sole owner of the company. In the

years before their dissolution, Lou's average salary was between $200,000 and $250,000.

Lou and Doris's marriage lasted 27 years. In July 2009, Doris filed for legal separation and then for dissolution. At the time that they separated, Doris and Lou both planned to retire within the next few years. The trial occurred in May 2011 and lasted five days. Lou sought to enforce the prenuptial agreement. The court denied enforcement, finding the agreement to be both substantively and procedurally unfair. Instead, it awarded Lou assets valued at over $3.5 million and Doris assets valued at approximately $2.5 million, plus maintenance of $4,000 per month for eight years. Both parties moved for reconsideration. The court denied Lou's motion and granted Doris's motion in part. Both parties now appeal. We discuss additional facts in the relevant sections below.

## ANALYSIS

Lou raises multiple issues. He challenges the trial court's refusal to enforce the prenuptial agreement, its exclusion of two witnesses, its valuation and characterization of certain assets, its division of assets and liabilities, and its award of maintenance to Doris. We reject each challenge.

We first address Lou's challenge to the decision not to enforce the prenuptial agreement. The court found,

> [T]he prenuptial agreement should not be enforced as it was both substantively and procedurally deficient at the time it was executed.

-3-

The agreement was substantively unfair as it did not properly provide for the growth of community property during the marriage. Specifically, paragraphs 4-6 and paragraph 16 of the prenuptial agreement (petitioner's Exhibit 69) were unfair to the petitioner. Further, the Court concludes that the amount of time to evaluate the prenuptial agreement (30 minutes), the inadequacy of the review by petitioner's then-counsel, and the short duration between the draft prepared by respondent's counsel and the date of signing (within five days of the wedding) provide substantial evidence that the petitioner was not adequately protected nor properly informed of her rights under Washington law.

Courts employ a two-pronged analysis for determining the validity of a prenuptial agreement.[2] First, the court decides whether the agreement makes fair and reasonable provision for the party not seeking enforcement of the agreement.[3] If it does, then the analysis ends, and the court will enforce the agreement.[4] If the agreement does not make a fair and reasonable provision for the opposing spouse, then the court must determine the procedural fairness of the agreement by answering two questions: (1) did the parties make full disclosure of the amount, character, and value of the property involved and (2) did they enter the agreement fully and voluntarily with independent advice and with full knowledge of their rights.[5]

---

[2] In re Marriage of Bernard, 165 Wn.2d 895, 902, 204 P.3d 907 (2009).
[3] Bernard, 165 Wn.2d at 902.
[4] Bernard, 165 Wn.2d at 902.
[5] Bernard, 165 Wn.2d at 902-03.

Absent a factual dispute, we review the substantive fairness of a prenuptial agreement de novo.[6] The party seeking to enforce the agreement has the burden of proving its validity.[7] Washington courts examine the agreement's terms and the surrounding circumstances at the time of execution and not at the time of enforcement.[8] The factors the court may consider when determining a prenuptial agreement's substantive fairness include (1) the proportionate means of each party, (2) restrictions on the creation of community property, (3) prohibitions on the distribution of separate property upon dissolution, (4) preclusion of common law and statutory rights to both community and separate property upon dissolution, (5) limitations on inheritance, (6) prohibitions on awards of maintenance, and (7) limitations on the accumulation of separate property.[9]

---

[6] Bernard, 165 Wn.2d at 902 (citing In re Marriage of Foran, 67 Wn. App. 242, 251 n.7, 834 P.2d 1081 (1992)).

[7] In re Estate of Crawford, 107 Wn.2d 493, 496, 730 P.2d 675 (1986).

[8] Bernard, 165 Wn.2d at 904.

[9] See, e.g., Bernard, 165 Wn.2d at 905 ("[A]n agreement disproportionate to the respective means of each spouse, which also limits the accumulation of one spouse's separate property while precluding any claim to the other spouse's separate property, is substantively unfair."); In re Marriage of Matson, 107 Wn.2d 479, 486, 730 P.2d 668 (1986) (holding that a prenuptial agreement was "grossly disproportionate" where all value, income, and earnings from separate property would remain separate upon dissolution); Foran, 67 Wn. App. at 249-51 (holding that a prenuptial agreement which waived any claim of right to separate property in the event of death or dissolution and effectively prohibited the growth of community property was substantively unfair).

Here, the court identified paragraphs 4, 5, 6, and 16 of the agreement as the provisions supporting the court's conclusion that the agreement did not fairly provide for the accumulation of community property. Paragraph 4 provides that the assets each party owned at the time of the agreement should remain separate property and that "[a]ny additions or enhancements in the value of separate property of either party which occurs due to major structural improvements of said property by community funds shall be community property only to the extent of the costs thereof and the appreciation due thereto." It further provides that any community funds otherwise used for the direct benefit of one party's separate property shall be deemed a gift of community property to the party owning the separate asset.

Paragraph 4 effectively extinguishes any community right of reimbursement for community funds expended on separate property for any purpose other than a major structural improvement. Notably, the agreement does not require that both spouses consent to these expenditures. Given Lou's disproportionate separate assets and income at marriage, this paragraph operates disproportionately in favor of Lou.

Paragraph 5 provides that all assets acquired with the proceeds of separate property shall remain separate property and that the parties can only commingle assets through "title documents, deeds and/or by recognizing and

listing both parties on any new assets or by adding the other party to the preexisting ownership as community property." This paragraph also affirmed that "any wages, salaries and/or other employment benefits attributable to the labor of either of them during such time that they shall be living together as husband[] and wife, shall be deemed community property." This paragraph restricts the creation of community property through commingling.

Paragraph 6 addressed the consequences of dissolution:

[I]in the event of a dissolution of their marriage, it is hereby agreed that each shall be awarded his or her own separate property as defined in this Agreement; and each of them expressly waives any rights that he or she may have or subsequently acquire in the separate property of the other. In addition, if the separate property contains any community property investment or lien therein which is to be divided by reason of any dissolution of marriage, that separate property shall nevertheless be awarded to the party who owns said property as his or her own separate property, not withstanding any community investment. The discharge of the community lien shall be made by some other mode through the disposition of jointly-acquired community assets and/or payments. The remaining community property is to be divided between the parties in a[n] equal manner.

This paragraph substantially modifies the statutory right of a spouse to a "disposition of the property and the liabilities of the parties, either community or separate, as shall appear just and equitable after considering all relevant factors."[10] It fails to account for the disproportionate means of Lou at marriage as well.

_____

[10] RCW 26.09.080.

Paragraph 16 provides that property acquired by the parties after marriage shall be owned in proportion to the amount of separate and community contributions used to purchase the assets. It also states,

> Lou shall always be entitled to any and all interest in and to his business even though he is spending community industry and labor thereon and any benefit flowing therefrom, provided, however, that Lou never take a salary of less than his present salary and provided, further, however, that no interest shall be given to Doris therein if a salary is taken in an amount lesser than his present salary if business circumstances would not allow the taking of his present salary.

This provision fails to account for both the inflationary factors that ordinarily operate on wages over time and any increase in the value of Lou's services over time due to increased skill or experience.

"There is nothing unfair about two well-educated working professionals agreeing to preserve the fruits of their labor for their individual benefit."[11] "However, an agreement disproportionate to the respective means of each spouse, which also limits the accumulation of one spouse's separate property while precluding any claim to the other spouse's separate property, is substantively unfair."[12] The agreement here provided significantly greater benefit to Lou and allowed him to expend considerable community labor on his separate property at the expense of the community. While paragraph 5 characterizes both

---

[11] In re Marriage of DewBerry, 115 Wn. App. 351, 365, 62 P.3d 525 (2003).

[12] Bernard, 165 Wn.2d at 905.

-8-

spouses' wages, salaries, and employment benefits as community property, paragraph 16 explicitly exempts Lou's labor and community contributions to his separate property business so long as he contributed an annual salary, capped in amount for all time, or such lesser amount as business circumstances allow, to the community. As a business owner, Lou alone controlled those business circumstances, which gave very little protection to the community. Further, the agreement provides that expenditure of community funds on the separate assets produces community property only if expended on "major structural improvements." All other community expenditures become gifts to the owner of separate property. The agreement deprives Doris of the right to request a just and equitable division of all of the parties' assets and liabilities without any corresponding consideration.

Doris testified that she believed the agreement was fair when she and Lou signed it, but she did not think it was fair now, given their circumstances upon dissolution. Lou cites this testimony as evidence of the agreement's substantive fairness. We disagree. Despite Doris's subjective beliefs, the disproportionate benefit to Lou, the restrictions on acquisition and growth of community property, the ability for Lou to utilize his community labor to grow his separate property business, and Doris's waiver of substantial statutory rights collectively establish a substantively unfair agreement.

Because Lou cannot establish the substantive fairness of the agreement, we must consider its procedural fairness. To determine whether a prenuptial agreement is procedurally fair, we consider (1) whether the parties fully disclosed the amount, character, and value of the property and (2) whether both spouses entered into the agreement freely and voluntarily, upon independent advice, and with full knowledge of their rights.[13] Our review for procedural fairness involves mixed issues of policy and fact; thus, we review the issue de novo, in light of the trial court's resolution of the facts.[14]

Because the parties do not dispute the adequacy of their premarriage property disclosures, we address only the second prong.[15] On this issue, the trial court found

> that the amount of time to evaluate the prenuptial agreement (30 minutes), the inadequacy of the review by petitioner's then-counsel, and the short duration between the draft prepared by respondent's counsel and the date of signing (within five days of the wedding) provide substantial evidence that the petitioner was not adequately protected nor properly informed of her rights under Washington law.

Substantial evidence supports this finding.[16] In re Marriage of Bernard[17] illustrates why. There, the court invalidated a prenuptial contract because the

---

[13] Matson, 107 Wn.2d at 483.
[14] Bernard, 165 Wn.2d at 903.
[15] Bernard, 165 Wn.2d at 905-06.
[16] Sunnyside Valley Irrigation Dist. v. Dickie, 149 Wn.2d 873, 879, 73 P.3d 369 (2003).
[17] 165 Wn.2d 895, 204 P.3d 907 (2009).

wife's attorney did not have enough time to review it adequately and the wife signed it without "'full knowledge of its legal consequences.'"[18] While the husband and his attorney worked on the agreement for nearly six months and regularly advised the wife to obtain independent counsel, they did not provide her with a draft agreement until 18 days before the wedding.[19] Three days before the wedding, the wife's attorney, an experienced family law practitioner, received a draft from the husband's attorney which was substantially different from the one the wife previously received.[20] He testified that he had insufficient time to fully review the proposed agreement or draft a counteragreement. He wrote his client a letter identifying five major areas of concern, but because the wife was involved with wedding preparations, he could not meet with her to discuss his concerns.[21] She signed the prenuptial agreement the day before the wedding with the understanding that they could amend the document later to address her attorney's concerns.[22] The court held that these circumstances provided substantial evidence to support the trial court's finding of procedural unfairness.[23]

---

[18] Bernard, 165 Wn.2d at 906.
[19] Bernard, 165 Wn.2d at 899.
[20] Bernard, 165 Wn.2d at 899.
[21] Bernard, 165 Wn.2d at 899.
[22] Bernard, 165 Wn.2d at 899-900.
[23] Bernard, 165 Wn.2d at 906.

Similarly, in In re Marriage of Foran,[24] the court invalidated an agreement due to procedural unfairness to the wife. The husband and his attorney worked on the agreement for over a month but did not give it to the wife until two days before the parties left for their wedding trip.[25] While the husband's attorney clearly informed the wife to have her own attorney review the document, she did not do so.[26] No one explained to her that the agreement allowed the husband, who already had significant separate assets, to increase his separate property at the expense of the marital community.[27] She also testified about domestic violence in their relationship and her belief that her husband would beat her if she did not sign the document.[28] The court found that the wife did not "voluntarily and intelligently" enter the prenuptial contract because she could not understand how economically unfair it was to her and to the marital estate.[29]

Here, Doris's cursory legal review of the document with her parents' attorney, the short period of time between receipt of a draft agreement and signing, and Doris's lack of full knowledge about its legal consequences provide substantial evidence to support the court's finding of procedural unfairness.

---

[24] 67 Wn. App. 242, 256-58, 834 P.2d 1081 (1992).
[25] Foran, 67 Wn. App. at 245.
[26] Foran, 67 Wn. App. at 245-46.
[27] Foran, 67 Wn. App. at 253, 255-56.
[28] Foran, 67 Wn. App. at 246.
[29] Foran, 67 Wn. App. at 257-58.

We next address Lou's challenge to the trial court's exclusion of two witnesses Lou wished to call to provide testimony about the valuation of Crown Finance. Shortly before trial, Bank of America canceled Crown Finance's line of credit and called in the outstanding debt. Lou liquidated his profit-sharing plan to pay the debt and avoid litigation.[30] Based on the elimination of this $1 million liability, Doris substantially increased her business valuation. As a result, Lou sought to call two fact witnesses having familiarity with "hard money" lender businesses to testify about the economy's impact upon the collectability of loans. Because Lou did not timely disclose these witnesses as required by King County Local Court Rule 26(k), the trial judge excluded their testimony.

We review a trial court's decision to exclude witnesses for an abuse of discretion.[31] Lou claims that the court erred by disregarding the factors set forth in Burnet v. Spokane Ambulance[32] before excluding the witnesses' testimony altogether and failing to make the findings required by Teter v. Deck.[33] In Burnet, the court articulated three factors that must be shown on the record before the court may impose one of the "harsher" discovery sanctions, such as dismissal, default, or exclusion of testimony: (1) willful or deliberate violation of the

---

[30] The court noted that while Lou's decision to liquidate the profit-sharing plan, rather than some other assets, resulted in an unnecessarily large tax burden, it did not find that Lou breached his duty to the community.
[31] Lancaster v. Perry, 127 Wn. App. 826, 830, 113 P.3d 1 (2005).
[32] 131 Wn.2d 484, 494, 933 P.2d 1036 (1997).
[33] 174 Wn.2d 207, 274 P.3d 336 (2012).

-13-

discovery rules and orders, (2) substantial prejudice to the other party's ability to prepare for trial, and (3) the trial court explicitly considered whether a lesser sanction would have sufficed.[34] In <u>Teter</u>, the court held that the trial court must make findings about the <u>Burnet</u> factors on the record, either orally or in writing.[35] A trial court abuses its discretion when it excludes witnesses without these findings.[36]

Here the trial court did not make findings on the <u>Burnet</u> factors before excluding Lou's proposed witnesses.[37] After hearing argument from both sides on Doris's motion to exclude, the court explained its decision to exclude:

> The standards under the local rule at issue here, Local Rule 26, have been applied fairly consistently and clearly in this court to exclude generally expert witnesses when there hasn't been full compliance with the provisions of the local rule.
> The Court doesn't have to find absolute prejudice as to the other party in order to exclude witnesses. The Court doesn't have to find that there aren't any options if the Court does allow the witnesses to testify. The Court has to find out from looking at what's been presented why the witnesses weren't provided in compliance with the provisions of the local rule.
> . . . .
> As the . . . local rule provides, . . . "Any person not disclosed in compliance with this rule may not be called to testify at trial, unless the Court orders otherwise for good cause and subject to such conditions as justice requires."
> I don't find any good cause basis for allowing these witnesses to testify.

---

[34] <u>Burnet</u>, 131 Wn.2d at 494.
[35] <u>Teter</u>, 174 Wn.2d at 217.
[36] <u>Burnet</u>, 131 Wn.2d at 494.
[37] In fairness to the trial court, we note that the Supreme Court issued its <u>Teter</u> opinion long after completion of the trial in this case.

. . . .

>     The untimely disclosure without good cause prejudicing substantially the petitioner leaves this Court to conclude that the motion in limine will be granted.

The trial court made no finding of willful violation or deliberate disregard of the local rule and does not appear to have considered any less severe sanction. The trial court erred. But Lou demonstrates no prejudice caused by this error.

Establishing error in a civil case without also showing prejudice does not provide grounds for reversal.[38] Lou has not shown any prejudice resulting from the exclusion of his two proposed witnesses. He represented to the trial court, "It is likely that [Lou] will only need to call one of these witnesses as a rebuttal witness if [Doris] maintains her new claim that Crown Finance is worth $1.6 million." The trial court rejected this claim by Doris. Thus, Lou prevailed on the issue for which he claimed to need these witnesses without them.

On appeal, Lou indirectly suggests prejudice. He points to the trial court's complaint about the lack of evidence for the value of Crown Finance, the court's dissatisfaction with his valuation expert, and the court's skepticism about Crown's accounting. Lou makes no express claim that an excluded witness would have testified about any of these issues. The record affirmatively suggests they would not. Lou identified each as a fact witness "needed to testify regarding the accounts [uncollectibility] and the effect of the housing crisis on both residential

---

[38] Saleemi v. Doctor's Assocs., Inc., 176 Wn.2d 368, 380, 292 P.3d 108 (2013).

-15-

and commercial lending." Lou did not identify either as being knowledgeable about Crown's operations, assets, or value. Lou has failed to establish any prejudice.

We next address Lou's challenges to asset valuation and characterization. He first claims that the trial court abused its discretion by adopting Doris's proposed $340,000 value for the Redmond Ridge investment property despite Lou's evidence that the building was worth "less than nothing." The trial court did not abuse its discretion. Where evidence at trial supports two different valuations, the court acts within its discretion by choosing a value anywhere between those two numbers.[39] Lou paid $340,000 for his 16.3 percent interest in the property in 2005. As late as 2010, he listed that "net investment" value on a financial statement. Lou testified that while he anticipated losing two tenants over the next year, the building was currently fully leased and only one tenant had defaulted on payments. The property manager testified that one building tenant was in default and would not renew the lease, the management company was in receivership, and Lou and the other owners were responsible for returning overpayments. She did not testify that the building had no value. While the court would have been justified in finding that the property had a lower value, given the

---

[39] See, e.g., In re Marriage of Soriano, 31 Wn. App. 432, 435, 643 P.2d 450 (1982) (citing In re Marriage of Lukens, 16 Wn. App. 481, 558 P.2d 279 (1976)).

-16-

economic climate, it did not abuse its discretion by adopting a value endorsed by Lou less than one year earlier.

Lou also asserts that the trial court erred when it declined to consider additional valuation evidence for Redmond Ridge presented in his motion for reconsideration. CR 59(a)(4) allows the court to grant a new trial based on "[n]ewly discovered evidence, material for the party making the application, which he could not with reasonable diligence have discovered and produced at the trial." We review a trial court's decision on a motion for reconsideration for an abuse of discretion.[40] Specifically, Lou asked the court to consider "new" evidence—that the property management company had filed for bankruptcy and the owners were liable for further payments and that while they were trying to sell the building, the realtor anticipated they would have to accept a short sale. The court found that Lou's proffered evidence did not satisfy the CR 59 standard.

We disagree with Lou's characterization of this evidence as "new." At the time of trial, the property management company was in receivership and the owners were responsible for repaying past overpayments they had received. The transition from receivership into bankruptcy is not a "new" development that would have changed the court's consideration of the property value.

---

[40] Palmer v. Jensen, 132 Wn.2d 193, 197, 937 P.2d 597 (1997).

Lou next contends that the court erred by characterizing the remaining payments due on a promissory note from Panos Properties as community property. Lou and his sister sold a jointly-owned investment property to Panos Property in 2005. Lou received $595,000 at closing and a promissory note for the balance, payable in monthly installments of $8,443, with a balloon payment of $778,000 due in November 2014. Apart from briefly alleging that the court's characterization was flawed, Lou fails to support this claim with argument or citation to authority;[41] therefore, we do not address it on appeal.

Also, Lou claims that the court erred by characterizing as community property and ultimately awarding the parties equal interests in the proceeds of a $117,833 loan made to Doris's mother, Marie Fink, prior to Fink's death.[42] Again, because Lou fails to support this claim with argument or authority, we do not consider it.[43]

Lou challenges the court's decision to award Doris maintenance. The trial court has broad discretion to award spousal maintenance.[44] RCW

---

[41] RAP 10.3(a)(6); Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

[42] Lou makes numerous assignments of error regarding this property interest. Initially, the court found no evidence to support Lou's contention that the loan was made out of his separate funds. It awarded him 50 percent of the proceeds and ordered Doris to pay $58,500. Then, when the court partially granted Doris's motion to reconsider, the court found that the lien was a community asset.

[43] RAP 10.3(a)(6); Cowiche Canyon, 118 Wn.2d at 809.

[44] In re Marriage of Bulicek, 59 Wn. App. 630, 633, 800 P.2d 394 (1990).

26.09.090 places one limitation on the amount and duration of maintenance: the award must be just.[45] The relevant statutory factors the court must consider include each party's financial resources; the age, physical and emotional condition, and financial obligations of the spouse seeking maintenance; the standard of living during the marriage; the duration of the marriage; and the time needed to acquire education necessary to obtain employment.[46]

The trial court awarded Doris $4,000 per month in maintenance for eight years based on Doris's need and Lou's ability to pay. Considering the relative positions of the two parties and the statutory factors, the court did not abuse its discretion.

Doris filed a conditional cross appeal, contending that the court erred by reducing the value of Crown Finance by over $1 million to account for a shareholder loan owed to Lou without including that $1 million as an asset awarded to Lou. As a result, she asks that if we remand the case to the trial court, we also correct this valuation error. Because we affirm the trial court's decision below, we accept Doris's waiver of this issue.

Both parties seek attorney fees under RCW 26.09.140, which allows the court to consider the parties' financial resources and award reasonable attorney

---

[45] In re Marriage of Luckey, 73 Wn. App. 201, 209, 868 P.2d 189 (1994).
[46] RCW 26.09.090; In re Marriage of Vander Veen, 62 Wn. App. 861, 867, 815 P.2d 843 (1991).

fees. When awarding fees, this court examines the arguable merit of the issues and the parties' financial resources.[47] However, the issues raised by Lou on appeal, though not warranting reversal in this case, had arguable merit. Given Doris's property distribution, as well as her pension payments, her Social Security income, and her maintenance award, she has not proved that she needs her attorney fees paid. Therefore, each party should pay his or her own fees.

## CONCLUSION

Because the record supports the trial court's decision that the prenuptial agreement was not enforceable, its exercise of discretion in valuing, characterizing, and dividing the parties' assets and liabilities, and its award of maintenance to Doris, we affirm.

_Leach, C.J._

WE CONCUR:

_Spearman, J._

---

[47] In re Marriage of Griffin, 114 Wn.2d 772, 779, 791 P.2d 519 (1990).