# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Marriage of: | No. 57931-6-II |
| CHASE P. HORNADAY, | |
| Appellant, | |
| And | |
| DIANA R. HORNADAY, | UNPUBLISHED OPINION |
| Respondent, | |

CRUSER, C.J. — Chase and Diana Hornaday[1] were married for nearly 11 years before they separated in August 2021. Diana left Chase after their two children, TH and QH, told her that Chase had been hitting them. Upon separating, Diana was granted a domestic violence protection order. Chase then petitioned for dissolution of their marriage. The trial court issued a temporary parenting plan under which Chase was required to undergo a domestic violence evaluation and follow all treatment recommendations before resuming visitation with his children. Chase was found in contempt for failing to begin treatment, and he had not yet completed treatment when the dissolution action proceeded to a bench trial.

At trial, Diana testified that Chase had explosive and unpredictable rage, threatened her, controlled her, posted nude photos of her online without permission, and placed the children in

---

[1] During the dissolution action, Diana changed her name to Diana Young. For clarity and consistency, we refer to her as Diana throughout.

dangerous situations. The court also considered a guardian ad litem (GAL) report and a letter from the children's counselor showing that the children disclosed being hit and yelled at by Chase. Chase testified and denied the abuse allegations.

The trial court found that there was an overwhelming history of domestic violence that warranted limitations on Chase in the parenting plan and that supported Diane's request for a restraining order against Chase. Based on its findings, the trial court issued a final parenting plan with limitations on Chase's contact with the children and granted Diana's request for a restraining order. The trial court also found that Chase was voluntarily underemployed and imputed income to him for the purpose of calculating his child support obligation, and ordered Chase to pay spousal support to Diana for four years.

Chase appeals, arguing that the trial court erred in issuing both the final parenting plan and the restraining order because the evidence was insufficient to support a finding of domestic violence. Additionally, Chase contends that the trial court erred by imputing income to him because the evidence did not establish that he relocated and got a lower paying job in order to reduce his child support obligations. Finally, Chase asserts that the trial court erred in awarding spousal support to Diana because it erroneously considered the history of domestic violence against Diana in its award. We affirm.

FACTS

I. BACKGROUND

Chase and Diana were married in 2009. They share two children, TH and QH, who were 10 and 6 years of age when the trial court entered its final parenting plan in 2023. Chase also has

two children from previous relationships, including KH, who was almost 18 years of age and lived in Utah at the time of the trial.

Diana was a stay-at-home parent for the majority of the marriage while Chase, a former Marine, was employed outside the home in the field of air traffic and ground control after he left the military. Chase changed jobs frequently, and they moved states several times to support Chase's employment. During this time, they resided in Washington state twice.

Chase underwent training in air traffic and ground control and had worked in this field for around six years at the time of trial. At the time of Chase and Diana's separation, Chase was working as a ground controller at Seattle-Tacoma International Airport (SeaTac) and made at least $36 to $39 per hour.

During the marriage, Chase owned at least three firearms. On one occasion, Chase accidentally discharged a firearm with QH in the same room and while Diana and TH were home. Chase also struggled with anger issues during the marriage.

Chase and Diana separated in August 2021. Diana moved to Utah with the children soon after the separation.

## II. LITIGATION

A. Protection Orders

Immediately upon their separation, Diana filed for a domestic violence protection order. Diana was granted a temporary protection order upon filing.

In September 2021, Chase agreed to the entry of a final protection order. The trial court found that Chase "respresent[ed] a credible threat to the physical safety of" Diane and the children and granted the final protection order for one year. Ex. 107 at 1.

In tandem with the protection order, the court also ordered Chase to surrender his firearms and other weapons. Chase initially surrendered only two of his three firearms. The trial court had to undertake a second hearing and issue a second order before Chase surrendered the remaining firearm.

A year later, the trial court renewed the protection order for another year after finding that Chase had "not proven based on a preponderance of the evidence that there ha[d] been a substantial change of circumstances to cause [the] court to deny the petition for renewal." Ex. 108 at 1. Nothing in the record suggests that Chase agreed to the renewal of the protection order. Chase did not move to revise or appeal the protection order or its renewal.

B. Temporary Parenting Plan

Meanwhile, soon after the trial court granted Diana the initial final protection order, Chase petitioned for divorce.

In November 2021, as part of a temporary parenting plan, the trial court ordered Chase to complete a domestic violence evaluation and to follow all treatment recommendations. Specifically, the temporary parenting plan required that Chase start and comply with treatment as recommended by the domestic violence evaluation and comply with ongoing treatment with the Department of Veterans Affairs (VA). The trial court also appointed a GAL in December 2021.

Chase underwent his initial evaluation in December 2021. In this evaluation, Chase admitted that he posted Diana's intimate photos on a website without her acknowledgment, though he denied engaging in any abusive behaviors. The evaluation identified verbal, emotional, psychological, and physical abuse, specifically yelling at Diana, using her sexually explicit photos

online without her permission despite an active protection order, and physically harming the children by slapping them, as behaviors that needed to be addressed in treatment.

This initial evaluation specifically recommended that Chase should: (1) continue his mental health treatment as recommended by his provider at the VA; (2) complete a level 3 domestic violence intervention treatment (DVIT) program for a minimum length of 52 weeks; and (3) complete a domestic violence victim's impact panel.

Because Chase was unhappy with his initial evaluation, he was evaluated again in May 2022 by a second evaluation center.[2] Chase's second evaluation returned similar results, but it also indicated personality anomalies, sociopathic traits, and psychopathic traits in its mental health screening. Additionally, it concluded that Chase had homicidal ideation in the preceding 12 months and stated that his readiness to change was low due to a low level of accountability and insight into his own actions.[3]

The second evaluation recommended that Chase complete a level 3 DVIT program for a minimum of once weekly for 12 months and engage in individual therapy for a minimum of twice a month while in DVIT treatment.

---

[2] Chase has expressed that he strongly disagrees with the result of his second evaluation.

[3] The second evaluation also included far more detail and noted inconsistencies regarding Chase's self-reporting. Chase stated that he was no longer taking medication to treat his mental health conditions and seemed to state that he was still in therapy even though he had discontinued therapy a few months prior. Chase also self-reported high-risk factors, including abuse of children, based on Chase's response to Diana's petition for a protection order in which Chase wrote that "he has slapped the children and threatened to slap them in the mouth." Ex. 121 at 3. Finally, in Chase's second evaluation, the evaluator stated that Chase failed to disclose his full legal history, including his charge for domestic violence and battery in Idaho.

Chase was later found in contempt for his delay in commencing treatment as outlined above. When trial started in the dissolution action, Chase had completed only 19 weeks of DVIT treatment.[4]

C. Bench Trial

Trial began in January 2023.

Chase broadly argued that the evidence of abuse was insufficient to support the strong limitations in the temporary parenting plan regarding his contact with his children. He requested a parenting plan with 50/50 custody, suspension of the domestic violence protection order requirements, and an adjustment in his child support obligation to represent his current income. Chase also denied any accusations of abuse. In addition, Chase argued that income should not be imputed to him because he moved to Utah to reestablish contact with the children once he was permitted to do so.

Diana argued that the permanent parenting plan should restrict Chase's contact with the children to phone calls until he completed domestic violence treatment as a limitation pursuant to RCW 26.09.191 because there was a significant history of domestic violence. She emphasized that Chase delayed his required treatment and failed to disclose his second domestic violence evaluation. Diana expressed that Chase's "own continued delay" in complying with his treatment requirements had kept him from progressing towards the next phase in the parenting plan, thereby preventing him from contacting the children. Verbatim Rep. or Proc. (VRP) (Jan. 31, 2023) at 11.

---

[4] Chase also completed the domestic violence victim impact panel in August 2022 and was complying with other treatment recommendations in the fall of 2022.

Diana also requested a continuing restraining order against Chase due to his domestic violence against her and his continued controlling and abusive behaviors since they separated. She further requested that Chase be ordered to pay child support and that income be imputed to him on the ground that he was voluntarily underemployed. Diana additionally requested spousal support given the length of Chase and Diana's marriage, the disparity in their incomes and resources, and her need to obtain further education.

1. Evidence at Trial

a. Chase's Testimony and Witnesses

Chase testified as the primary witness for his case. Chase broadly denied abusing either Diana or their children.

Chase testified regarding his progress in completing the requirements of the temporary parenting plan. He explained that he had completed 19 weeks of DVIT. And he claimed that he started DVIT when he did because it took time to find an office in Utah that met Washington standards and allowed his domestic violence class credits to transfer to Washington.[5]

Although Chase admitted to previously being in counseling for anger issues and stated that he is not currently in counseling, Chase expressed disagreement with his second domestic violence evaluation's finding that he had sociopathic and psychopathic traits. Regarding his delay in beginning DVIT, Chase testified that he delayed because he was not ordered to begin treatment by

---

[5] According to Diana, Chase offered no proof that his DVIT provider in Utah "is equivalent to or following the requirements of Level 3 DVIT set out in [WAC] Chapter 388-60B." Clerk's Papers (CP) at 853-54. Diane further asserted that the classes listed on the website for Chase's DVIT provider "d[id] not appear" to satisfy the requirements for level 3 DVIT. *Id.* at 854.

a particular date and the order did not create a "ticking time" in which to complete the treatment, "especially since [he] was seeking a second evaluation." *Id.* at 46.

Chase also testified that when he initially posted intimate photographs of Diana online,[6] he did so with Diana's consent. But he conceded that Diana revoked consent to share her photographs prior to their separation. Chase also conceded that after Diana revoked her consent, he reposted older photographs that had already been purchased, that were already free online, or that Diana previously agreed to posting.

When asked about his move from Washington to Utah and his subsequent drop in income, Chase testified that he moved and accepted a lower paying job because he wanted to be close to his children, including KH, who was planning to move in with Chase once KH turned 18. Chase stated that it made more sense to him to be closer to his children. Regarding his career change after moving to Utah, Chase expressed that he did not get a job in air traffic control because air traffic control jobs were "not hiring in [Utah]" when Chase moved there. *Id.* at 37. When asked if he could afford all of the financial obligations requested by Diana, Chase said he would be unable to because he only makes $24 per hour at his current job.

Chase also called a former neighbor and former coworker who both expressed a positive view of Chase's demeanor and interactions with children.

---

[6] During their marriage, Chase and Diana posted intimate photographs of Diana on multiple websites used for selling intimate photographs and videos to individuals. Chase and Diana had accounts on these sites that allowed them to post those photographs to an account page, manage subscribers, and facilitate sales of those photographs.

b. Diana's Testimony

In contrast to Chase's testimony, Diana's testimony communicated a history of abuse. Diana testified that the day before she and Chase separated, the children told Diana that Chase had been hitting them in the face.[7]

Diana then testified regarding Chase's severe anger issues. She stated that Chase had explosive rage and that it was impossible to know what would set it off. Diana recalled times where Chase would scream at her and be physically intimidating by not allowing her to leave the room or cornering her, among other things. Diana also shared that Chase would make threats and that there were times when Chase's explosive temper was aimed at the children. Diana stated that Chase's temper was unrestrained regardless of who was watching or where he was.

Diana also recounted that Chase discharged a firearm in their home in the same room as QH.[8] Diana admitted that she was very afraid that Chase was going to become physically violent, in part because Chase made threats of physical violence starting when Diana was pregnant with QH and Diana said no to a sexual request that Chase had made. Diana shared that Chase would randomly say things such as if Diana ever hit him, he would hit her back "ten times harder." VRP (Feb. 1, 2023) at 81. However, Diana stated that Chase had never physically hit her.

Diana further testified that Chase was coercive, especially sexually. For example, Diana stated that if she was not comfortable doing something sexual, Chase would threaten and manipulate her by telling her things such as if she refused to do what he wanted, it would be her

---

[7] Diana audio recorded QH telling her that Chase hit her and TH.

[8] QH told Diana that Chase fired the gun in front of her. Chase stated that it was a " '[m]isfire.' " Ex. 119 at 5. Previously, Chase had described the incident as a "negligent discharge." CP at 484.

fault if he cheated on her. Diana testified that Chase would then badger her and make her life miserable until she gave in – often doing less around the house, neglecting any tasks related to the children, stonewalling or being mean to her, or making the house messier so that she had more to do with less support.

Diana also asserted that Chase coerced her into posting intimate photos online and that she had first revoked consent to post her photos in May 2021. Despite her revocation, Chase continued to post intimate photographs of her online and admitted to doing so via text to Diana in August 2021.[9] Diana stated that since their separation in August 2021, Chase had reposted more than a thousand photos and videos, asked one of the websites hosting an account not to cancel their account, and posted new photos of Diana.

Diana stated that since the issuance of the September 2021 final protection order, Chase's behavior continued to be threatening. She testified that after she left him, Chase texted her cousin "threatening things" and claiming to know that Diana and the children were with her cousin. VRP (Feb. 1, 2023) at 100-01. Diana shared that Chase also attempted to track her phone in September and October 2021.

Diana stated that as soon as phone calls between Chase and the children began, Chase asked the children where they were.[10] Additionally, Diana told the court that after the children's

---

[9] The record contains many pages of text messages between the two regarding the intimate photos. Generally, the texts show that Diana told Chase she was very uncomfortable, afraid, and revolted by Chase's requests to take sexual photos and videos of her and that Chase was angry and pushed her to continue allowing it. Other text messages include accusations of anger and Chase treating Diana poorly.

[10] Chase would apparently ask the children multiple questions about where they were living with Diana. Chase also recorded phone calls between himself and the children from October 2021 to August 2022, even after the trial court ordered Chase to stop recording the calls.

interviews with the GAL, Chase was "very pushy" on a phone call to find out what the children said to the GAL. *Id.* at 102. According to Diana, QH repeatedly tried to change the subject, but Chase would not let her. When QH finally shared that she had told the GAL that Chase had been hitting her, Chase said that had " 'never happened.' " *Id.* Diana also shared that there have been many phone calls where TH simply left the room because he did not want to talk with Chase. Diana additionally testified that Chase repeatedly told the children that it was up to Diana whether he could see them and that they could see him if she let them.

Diana also testified about Chase's relationship with his ex-wife. Diana recalled Chase's calls with his ex-wife being very volatile and verbally violent. Diana shared that Chase had previously been charged with battery and domestic violence in Idaho due to his relationship with his ex-wife. Diana also stated that Chase had once left the house and then returned and told her that he had broken into his ex-wife's house; stolen some things, including his ex-wife's passport; and ruined his ex-wife's wedding dress.

In Diana's testimony regarding Chase's income, she referenced a text message in the record that Chase sent her in which he said that he was going to start "seriously" looking for jobs outside of Washington due to the state employee COVID-19 vaccine mandate and his perception of the state as too progressive and expensive. Ex. 140 at 1. In the message, Chase stated that he would refuse to get the vaccine and planned on working until he was fired for noncompliance.

c. Diana's Other Witnesses

Diana's sisters, Melanie and Leslie, testified on Diana's behalf.

Melanie testified that Diana and Chase's marriage was volatile to the point it caused Diana to live with her during Diana's pregnancy with TH. Melanie also observed that Chase's parenting

was more intense and aggressive than Diana's. Melanie stated that Chase seemed to have a short temper with the children and that she saw him grab the children's arms a couple of times. Melanie further testified that when Diana called her when she was separating from Chase, Diana was very scared, did not feel safe, and felt like things were escalating. VRP (Feb. 1, 2023) at 162.

Leslie testified that Chase's communications with Diana felt overbearing and that Chase would contact Leslie and Melanie to tell them intimate details about Diana and Chase's relationship. Leslie testified that later in Diana and Chase's marriage, she heard them yelling at each other, and she noticed quick tempers on the part of both Diana and Chase.

Leslie also stated that Chase frequently yelled at the children. Leslie was especially concerned that Chase did not seem to care if the children wore seatbelts in the car. In addition, Leslie stated that after Diana and Chase's separation, QH seemed more nervous around men.

#### d. Exhibits

In addition to the testimony, Diana presented several exhibits, including the GAL report, a letter from the children's counselor, and other documents, that were admitted at trial without objection. Chase did not present any exhibits.

##### i. The GAL Report

The October 2022 GAL report submitted to the court addressed: (1) issues related to making a parenting plan for the children, (2) Chase's domestic violence, and (3) Chase's mental health. As part of the investigation, the GAL interviewed Chase, Diana, and the children, and she reviewed a number of documents.

The children individually told the GAL that they were afraid of Chase and concerned about seeing him. As part of the investigation, the GAL had a telephone call with the children's

counselor, Johnathan Colbey Strong. In addition to providing the same information he provided in a letter to the court, Strong shared with the GAL that reunification between Chase and the children was appropriate but that the children would need to be prepared for reunification if the court ordered reunification.

In the GAL's assessment, she stated that both parents were actively involved in the care of the children. The GAL also noted that Chase planned to move closer to the children to spend time with them in the future when he was allowed visitation. The GAL discussed Chase's treatment up to that point, noting that his DVIT providers described him as "dedicated, [having] good attendance, participation, attitude, and completion of assignments." Ex. 119 at 11.[11]

The GAL ultimately recommended that Diana maintain primary custody of the children. The GAL also recommended three phases for reunification and parental visitation, starting with supervised two-hour visits up to twice a week parallel to reunification counseling for Chase and the children. In the second phase, the visitation would transition to day visits after three months of reunification counseling. And finally, the visitation would transition to every-other-weekend visits after three months of day visits with continued reunification counseling. The GAL additionally recommended that the protection order be modified to include third party visitation, that Chase continue and complete DVIT, and that Chase and Diana enter co-parenting counseling once the protection order was lifted.

---

[11] At the time, Chase was complying with treatment recommendations and was enrolled in domestic violence treatment at Assessment, Counseling, and Education Services, Inc. in Utah.

ii. Letter from the Children's Counselor

The children began receiving mental health treatment with Strong in May 2022. As part of the dissolution proceedings, Strong wrote a letter, providing some details shared by the children during counseling. The letter noted that during their appointments, both children shared, "unprompted" "fear and trauma" regarding what happened with Chase. Ex. 143 at 1. Strong stated that what the children expressed would "be classified as emotional and physical abuse" by Chase. *Id.*

Strong wrote that the children told him about experiences of abuse where Chase "hit" or "slapped" or "yelled at" and "degraded" them. *Id.* Strong also noted that the children each expressed fear regarding those instances of abuse. Strong stated that the "effects" of abuse on the children were perceptible, that they were "still struggling" with those effects, and that those effects had caused "difficult interruptions to their daily life." *Id.* As an example, QH informed Strong that she "felt nervous" around men and that she was "scared and concerned for her life" because she feared that another person might behave "like [Chase]" and "shoot a gun at her." *Id.*

iii. Other Exhibits

Diana proffered several additional exhibits relevant to Chase's anger issues. One exhibit included an image of a list of symptoms written by Chase prior to attending his first VA

appointment. The list included: "angry all the time – unprovoked," "marriage issues," and "extreme lack of empathy." Ex. 125 at 1.[12]

Another exhibit included screenshots of texts between Chase and a friend. In one message, Chase said that he "used to try and pick fights with people" in an attempt to feel what he felt in combat. Ex. 138 at 2. In another message, Chase said he was "always angry. . . always." *Id.* at 3. Finally, Chase later messaged that not killing enemies overseas during combat was made "more upsetting" because he "had more enemies back home that it was never legal to kill." *Id.* at 5.

Diana also offered exhibits showing Chase's digital tracking and controlling of her electronic accounts. One exhibit included text messages received by Diana indicating that Chase's phone number signed up for a service to track and locate her phone after their separation. Another exhibit included screenshots of account recovery of the email address used for one of Chase and Diana's online accounts that showed that the password, account recovery email, and account recovery phone number had been changed so that Chase could access the account after their separation.

Regarding their online accounts, Diana provided exhibits that included emails to one of the websites from September 2021, requesting that the account be re-registered with a different email and that the account not be deleted. Additionally, Diana provided exhibits that included

---

[12] Chase testified that this list was a "handwritten list of an advise list by VA . . . help websites to make sure [veterans] are getting the most out of [their] VA disability. It does not necessarily mean I have all of them or agree with all of them." VRP (Jan. 31, 2023) at 44. In contrast, Diana testified that the list was a list of Chase's actual symptoms for his June 2021 counseling appointment at the VA. She explained that "[p]rior to [Chase's] appointment he was told to make a list of his symptoms, not hypothetical symptoms. These were not suggestions. [Chase] was told to make a complete list of everything that he personally experienced." VRP (Feb. 1, 2023) at 84. Diana also stated that all the symptoms listed were ones that she witnessed.

screenshots from one of Chase and Diana's online accounts that showed posts from September 2021, including photographs of Diana's face and personal, non-intimate images, in addition to more sensitive photographs.

2. Final Parenting Plan

After hearing the testimony and considering the evidence, the trial court found that Chase had (1) physically and emotionally abused or threatened to abuse a child, (2) a history of domestic violence, (3) "a long-term emotional or physical problem that gets in the way of his ability to parent," and (4) engaged in abusive use of conflict in a manner that could cause serious damage to the psychological development of the children. Clerk's Papers (CP) at 1063. Accordingly, the trial court concluded that RCW 26.09.191 limitations must be imposed.

In its oral ruling, the trial court specifically found that Chase had subjected Diana to "continuous threats of physical assault, sexual assault, and a pattern of emotional abuse." VRP (Feb. 13, 2023) at 214. The trial court stated that the evidence was "overwhelming" on the issue of domestic violence. *Id.*

As a result, the trial court found that a parenting plan that included phased-in time for Chase with the children was in their best interests. The trial court ordered a seven-phase parenting plan with limitations on Chase. In addition to the seven-phase plan, the trial court subjected Chase to additional counseling and treatment requirements. As a result of the limitations, Diana has the sole decision-making authority under the parenting plan.

3. Restraining Order

The trial court granted Diana's request for a restraining order, finding that she had a "reasonable fear" and that "ongoing protection" was needed. CP at 1098. The restraining order stated that it expired on December 31, 2033, over 10 years and 10 months after it was issued.

4. Child Support

Regarding the child support calculation, the trial court found that (1) Chase was voluntarily underemployed because he willingly left his employment in Washington for a lower paying job in Utah, and (2) he did so to reduce the amount of child support. Based on these findings the trial court imputed income to Chase and calculated his child support obligation using the imputed income.

5. Spousal Maintenance

When considering spousal maintenance, the trial court considered the fact that Diana moved frequently throughout the marriage in order to accommodate and support Chase's career. The court stated that Diana had "less earning capacity" at the time of trial and that there was "great need" for spousal maintenance. VRP (Feb. 13, 2023) at 218-19.

The court further stated that although it was not permitted to consider fault, under *In re Marriage of Foran*, 67 Wn. App. 242, 834 P.2d 1081 (1992), it could consider "a history of domestic violence limiting the wife's ability to work due to a long-term abuse." *Id.* at 219. The court found that Diana had "a need for support," and Chase had "the ability to pay." CP at 1097. The trial court awarded maintenance to Diana for four years.

At the conclusion of trial, the court issued written findings of fact and conclusions of law and entered a final child support order, parenting plan, restraining order, and dissolution decree.[13]

Chase appeals the parenting plan, the restraining order, the child support order, and the spousal maintenance order.

ANALYSIS

Chase argues that the trial court erred when it (1) imposed limitations on his contact with his children under RCW 26.09.191, (2) granted the restraining order based on findings of sexual, physical, and emotional abuse that were not supported by the record, (3) imputed income to Chase when the evidence was insufficient to establish that he was purposely underemployed to reduce his child support income, and (4) considered Chase's history of domestic violence as a factor in ordering Chase to pay spousal support. These arguments fail.

I. LIMITATIONS ON CHASE IN THE FINAL PARENTING PLAN[14]

Chase argues that the trial court abused its discretion in restricting his parenting time with the children in the final parenting plan because substantial evidence did not support its finding of

---

[13] The trial court re-issued the final divorce order two days after trial due to a scrivener's error.

[14] Chase also raises an additional issue regarding the parenting plan – that "[t]he trial court's parenting plan was not specific as to the number of phone calls per week, thereby improperly limiting and effectively eliminating Chase's contact with the children under phase one," contrary to the language in the order stating that he " 'shall' " have phone contact with the children. Br. of Appellant at 33-34 (boldface omitted). The order provides, "Chase Hornaday shall have telephone contact with the children up to three times per week, if the children's counselors approve the calls. Calls should be up to 10-15 minutes per call. The children will initiate the calls to Chase Hornaday. The children may terminate the calls earlier if uncomfortable." CP at 1064.
 Because the order states that it is up to the children to initiate up to three the calls per week and gives the children the option to end the calls at their discretion, the order, read in its entirety, gives the children the discretion to be involved in the calls and, contrary to Chase's assertions, does not mandate telephone contact. Accordingly, this argument fails.

domestic violence under RCW 26.09.191(2).[15] Specifically, Chase contends that the trial court's findings of fact and conclusions of law reflect insufficient consideration of RCW 26.09.191(2)(n) and RCW 26.09.191(3)(b), statutory provisions he contends the trial court is required to consider before imposing RCW 26.09.191 limitations. Chase also argues that the trial court should not have relied on past protection orders and that it should have given more weight to the GAL's recommendations and to Chase's evidence. These arguments fail.

A. Legal Principles

We review a trial court's parenting plan for an abuse of discretion. *In re Marriage of Black*, 188 Wn.2d 114, 127, 392 P.3d 1041 (2017). A trial court abuses its discretion when its decision is manifestly unreasonable, based on untenable grounds or reasons, or the trial court misapplies the law. *Id.* A trial court's decision is based on untenable grounds or reasons if the factual findings are not supported by the record or if the facts do not meet the requirements of the applicable standard. *In re Parenting & Support of L.H.*, 198 Wn. App. 190, 194, 391 P.3d 490 (2016).

We determine whether a trial court's findings of fact are supported by substantial evidence. *Black*, 188 Wn.2d at 127. Substantial evidence is that which would persuade a fair minded and rational person of the truth of a stated premise. *In re Marriage of Olson*, 69 Wn. App. 621, 626, 850 P.2d 527 (1993). We do not, however, reweigh the evidence to determine if we would reach a

---

[15] To the extent Chase may also be attempting to argue that the trial court failed to make findings on the seven factors enumerated in RCW 26.09.187(3)(a), this argument fails because the trial court was not required to make such findings once it limited Chase's contact under RCW 26.09.191. RCW 26.09.187(3)(a) ("Where the limitations of RCW 26.09.191 are *not* dispositive of the child's residential schedule, the court shall consider [the seven enumerated] factors." (Emphasis added.)).

different conclusion from the trial court. *In re Marriage of McNaught*, 189 Wn. App. 545, 561, 359 P.3d 811 (2015).

Trial courts have broad discretion in developing parenting plans. *In re Marriage of Katare*, 175 Wn.2d 23, 35, 283 P.3d 546 (2012). They must, however, wield this discretion in the best interest of the children and, in most instances, only after considering the factors identified in RCW 26.09.187(3). *In re Parentage of J.H.*, 112 Wn. App. 486, 492-93, 49 P.3d 154 (2002). RCW 26.09.187(3) establishes seven factors that the trial court must generally consider when making residential provisions for each child. But trial courts are also restrained by RCW 26.09.191, which mandates restrictions in permanent parenting plans in specific cases and permits restrictions under other circumstances.

Relevant here, under RCW 26.09.191(2)(a)(ii) and (iii), a parent's residential time with the children *shall be limited* when the parent has engaged in the "physical, sexual, or a pattern of emotional abuse of a child" or the parent has "a history of acts of domestic violence as defined in RCW 7.105.010." But an exception to this mandatory provision exists under RCW 26.09.191(2)(n), which provides that the court may waive the mandatory limitations upon making certain express findings regarding lack of harm to the child.[16]

Additionally, RCW 26.09.191(3)(b) gives the trial court the discretion to limit or preclude any provision of the parenting plan when a parent has a "long-term emotional or physical impairment which interferes with the parent's performance of parenting functions as defined in RCW 26.09.004."

---

[16] We set out this statute in more detail below.

B. Application

Chase argues that substantial evidence does not support the trial court's decision to impose restrictions against him in the parenting plan under RCW 26.09.191(1) and (2)(a). This is so, Chase argues, because (1) the trial court did not make any findings under RCW 26.09.191(2)(n) or RCW 26.09.191(3)(b); (2) the trial court improperly relied on the past domestic violence orders because they were stipulated orders and he was coerced into stipulating and the past domestic violence orders were based on "vague allegations" by Diana that were either not credible or did not "rise to the level of 'domestic violence' under RCW 7.105.010(9)(a) and (b);" and (3) the trial court should have given greater weight to the recommendation of the GAL and to his own evidence. Br. of Appellant at 30-31. These arguments fail.

1. RCW 26.09.191(2)(n) and (3)(b)

Chase cites no authority for his contention that the trial court must make affirmative findings under RCW 26.09.191(2)(n) or (3)(b) as a precondition to imposing restrictions in a parenting plan under RCW 26.09.191(1) or (2)(a). Under RCW 26.09.191(2)(n), a trial court, having made factual findings that would ordinarily mandate the imposition of restrictions on a parent under RCW 26.09.191(1) and (2)(a), may waive those mandatory restrictions under certain

conditions if it makes express findings that demonstrate a lack of risk to the child.[17] But there is nothing in the text of RCW 26.09.191 that requires affirmative findings by the trial court to the effect that a parent in fact poses the dangers listed in (2)(n) before a trial court is permitted to impose restrictions on a parent under RCW 26.09.191(2). Nor does Chase cite any cases in support of this contention.[18]

And although pursuant to RCW 26.09.191(3)(b), the trial court may preclude or limit any provision of the parenting plan if it finds that the parent has "[a] long-term emotional or physical impairment which interferes with the parent's performance of parenting functions as defined in RCW 26.09.004," there is nothing in the text of RCW 26.09.191 that requires a trial court to make a finding under (3)(b) before it is permitted to impose restrictions on a parent under RCW 26.09.191(1) or (2)(a). Nor, again, does Chase cite any cases in support of this contention.

---

[17] Specifically, RCW 26.09.191(2)(n) provides:
> If the court expressly finds based on the evidence that contact between the parent and the child will not cause physical, sexual, or emotional abuse or harm to the child and that the probability that the parent's or other person's harmful or abusive conduct will recur is so remote that it would not be in the child's best interests to apply the limitations of (a), (b), and (m)(i) and (iv) of this subsection, or if the court expressly finds that the parent's conduct did not have an impact on the child, then the court need not apply the limitations of (a), (b), and (m)(i) and (iv) of this subsection. The weight given to the existence of a protection order issued under chapter 7.105 RCW or former chapter 26.50 RCW as to domestic violence is within the discretion of the court. This subsection shall not apply when (c), (d), (e), (f), (g), (h), (i), (j), (k), (l), and (m)(ii) of this subsection apply.

[18] We note that Chase relies on the unpublished case *In re Marriage of Gitre*, No. 54806-2-II, slip op. (Wash. Ct. App. Mar. 15, 2022) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2054806-2-II%20Unpublished%20Opinion.pdf. But, unlike here, in *Gitre* the trial court assigned a parent who would otherwise be subject to limitations under RCW 26.09.191 as the primary custodian for the children, so findings were clearly required under RCW 26.09.191(2)(n). *Gitre*, No. 54806-2-II, slip op. at 20.

2. Reliance on Past Protection Orders

With regard to Chase's argument that the trial court improperly relied on past domestic violence orders because he was coerced into agreeing to the entry of these orders, Chase does not direct us to any evidence supporting his assertion that he was coerced into agreeing to the entry of the initial final protection order. And the record does not show that Chase agreed to the entry of the renewed protection order.

Regarding Chase's argument that the trial court improperly relied on the past domestic violence orders because they were based solely on Diana's vague allegations that did not rise to the level of domestic violence under RCW 7.105.010(9)(a) and (b), Chase stipulated to the entry of the September 2021 order and cannot now challenge the factual basis for that order. And with regard to the renewed protection order, the court renewed the September 2021 order because Chase failed to prove any substantial change in circumstances, not based on any allegations by Diana, so Chase's assertion that the trial court relied on Diana's allegations has no basis.

Accordingly, Chase does not demonstrate that the trial court improperly relied on the prior protection orders when determining whether to impose the restrictions under RCW 26.09.191(2)(a).

3. GAL Report and Chase's Evidence

Finally, regarding Chase's contention that the trial court should have given more weight to the GAL report and to Chase's evidence, we do not reweigh evidence or make credibility determinations. *McNaught*, 189 Wn. App. at 561. These determinations are solely within the purview of the trial court. *Id*.

Substantial evidence supports the trial court's findings of domestic violence and its imposition of restrictions on Chase pursuant to RCW 26.09.191(2)(a). Diana's testimony illustrated a history of abuse that was corroborated in part by testimony from her sisters, as well as the GAL report. Additionally, multiple exhibits, as well as Diana's and Chase's testimonies, demonstrated that Chase continually violated Diana's protection order by attempting to track her location and initially failing to surrender all of his firearms, among other things.[19] And none of Chase's arguments establish that the trial court erred. Accordingly, we hold that the trial court did not abuse its discretion in limiting Chase's parenting time in the final parenting plan.

## II. RESTRAINING ORDER

Chase next argues that the trial court erred in granting the restraining order for many of the same reasons that the trial court erred in placing restrictions on Chase's parenting time. He argues that substantial evidence does not support the trial court's findings of sexual, physical, and emotional abuse.[20] Chase contends that Diana's testimony and exhibits regarding Chase's abuse are broad assertions about alleged harm, unsupported by substantial factual evidence, and therefore do not justify the restraining order. We disagree.

A. Legal Principles

In a dissolution decree, the trial court shall make provisions for any necessary continuing restraining orders. RCW 26.09.050(1). We review a trial court's decision to enter a restraining

---

[19] To support his argument, Chase relies on *State v. Ancira*, 107 Wn. App. 650, 27 P.3d 1246 (2001). But *Ancira* is inapposite because it is a criminal case and the "extreme degree of interference with fundamental parental rights" referred to a complete bar against the father's contact with his children is not at issue here. 107 Wn. App. at 654.

[20] He again cites *Ancira*, which does not apply for the same reasons discussed previously.

order for an abuse of discretion. *In re Marriage of Kowalewski*, 163 Wn.2d 542, 553, 182 P.3d 959 (2008).

B. Application

Substantial evidence of a history of domestic violence, including evidence that the offending partner fantasized about killing the other, is sufficient to support the imposition of a restraining order. *E.g.*, *In re Marriage of Mishko*, 23 Wn. App. 2d 571, 578, 519 P.3d 240 (2022). Here, there is substantial evidence to support the imposition of a restraining order. Diana's testimony alone substantially supported a finding of domestic violence. And it was further corroborated by the breadth of exhibits and the testimony of others, including Chase. As such, the trial court did not abuse its discretion in granting Diana a 10-year restraining order against Chase.

III. CHILD SUPPORT ORDER

Chase also argues that the trial court erred by improperly imputing income to him because its finding that Chase was intentionally trying to lower his income to reduce his child support payments was not supported by substantial evidence. Chase asserts that the evidence showed that he left his job and moved to be closer to the children so he could exercise parenting time with them once he was allowed contact, not to purposefully lower his income. Chase argues that "[t]he fact that [he] has not been able to replace the income he had in Washington should not be held against him when his perfectly valid reason for leaving was the support of his children, not to harm them by providing less support." Br. of Appellant at 39. We disagree.

A. Legal Principles

We review a trial court's decision regarding child support for abuse of discretion. *In re Marriage of Pollard*, 99 Wn. App. 48, 52, 991 P.2d 1201 (2000). For the purposes of child support,

trial courts "shall impute income to a parent when the parent is voluntarily unemployed or voluntarily underemployed." RCW 26.19.071(6). The court determines whether a parent is voluntarily unemployed or underemployed by considering multiple factors. *Id.* But the court "shall not impute income to a parent who is gainfully employed on a full-time basis, unless the court finds that the parent is voluntarily underemployed *and finds that the parent is purposely underemployed to reduce the parent's child support obligation.*" *Id.* (emphasis added).

*Pollard* provides a two-step analysis consistent with RCW 26.19.071(6) for trial courts to apply when considering whether to impute income to a parent. 99 Wn. App. at 52-53. First, the trial court must consider whether the parent is voluntarily underemployed based on the factors outlined in RCW 26.19.071(6). *Id.* Then, if the court determines that the parent is " 'gainfully employed on a full-time basis' " but also underemployed, the court must further determine whether the parent is "*purposely underemployed to reduce his [ ] support obligation.*" *Id.* at 53 (emphasis added) (quoting RCW 26.19.071(6)).

B. Application

Here, substantial evidence supports the trial court's finding that Chase was purposefully underemployed in order to reduce his child support obligation. Chase's testimony on his qualifications was sufficient to show that he could have obtained higher paying employment, including at a Utah airport – Chase specifically testified that he was a ground controller at SeaTac, an FAA airport, and was qualified to work as an air traffic controller at "thousands of federal contract airports, Department of Defense airports, and local communal airports." VRP (Feb. 1, 2023) at 193. He also testified that he left his $36 per hour job at SeaTac for a lower paying job in a factory in Utah in order to be closer to his children. But there was also evidence that Chase

intended to fail to comply with the Washington COVID vaccine mandate, get fired, and leave the state because he perceived Washington as being too progressive and expensive.

It was within the trial court's discretion to infer that Chase's testimony regarding his reason for moving was not credible, particularly because Chase had expressed other reasons for leaving Washington and he would not have been able to see the children in the near future and he was not taking the court-ordered steps that would allow him to see them sooner. Therefore, we conclude that substantial evidence supports the trial court's findings underlying its decision to impute his income. As such, the trial court did not abuse its discretion in imputing income to Chase.

IV. SPOUSAL SUPPORT

Finally, Chase argues that the trial court erred by considering evidence of domestic violence when determining whether Diana was entitled to spousal support. He contends that the trial court's reliance on *Foran* as support for its finding that the alleged abuse in this case warranted a spousal support award is misplaced because there is no evidence that any abuse impacted Diana's ability to further her education or work. We disagree.

A. Legal Principles

In a dissolution proceeding, trial courts may grant spousal support. RCW 26.09.090(1). The support amount "shall be in such amounts and for such periods of time as the court deems just, without regard to misconduct," after the court considers all relevant factors including but not limited to the parties' financial resources and obligations; the time needed to acquire training or education sufficient to fine appropriate employment; the standard of living during the marriage; the duration of the marriage; and the party seeking support's age and physical and emotional condition. RCW 26.09.090. Although the trial court cannot consider fault, it may consider

evidence of the effect of domestic violence with respect to the circumstances surrounding a spouse's need for spousal support. *Foran*, 67 Wn. App. at 259.

We review a trial court's ruling concerning a spousal support award for abuse of discretion. *In re Marriage of Zahm*, 138 Wn.2d 213, 226-27, 978 P.2d 498 (1999). "Nothing in RCW 26.09.090 requires the trial court to make specific factual findings on each of the factors listed in RCW 26.09.090(1)." *In re Marriage of Mansour*, 126 Wn. App. 1, 16, 106 P.3d 768 (2004). But it is an abuse of discretion when an award of spousal support does not evidence a fair consideration of the statutory factors. *In re Marriage of Spreen*, 107 Wn. App. 341, 349, 28 P.3d 769 (2001).

B. Application

Here, the trial court considered Diana's history of moving to accommodate and support Chase's career, Diana's earning capacity, Diana's need for support, the credibility of Chase's testimony, Chase's ability to work, and the disparity in Chase's and Diana's respective incomes. Regarding its consideration of the history of domestic violence, the court specifically stated that it was not considering that factor as evidence of fault. Rather, it was considering the effect of the abuse on Diane's ability to work as permitted under *Foran*.

The trial court considered multiple factors other than domestic violence in awarding spousal support, as required under RCW 26.09.090. Regarding its consideration of domestic violence, the trial court made clear that it was considering the history of domestic violence only in the context of how domestic violence limited Diana's ability to work, as permitted under *Foran*. As mentioned by Diana, it is presumed that trial court knows the rules of evidence and that it considered only the evidence properly before it and only for proper purposes.

Chase contends that the trial court could not consider the past abuse because, unlike in *Foran*, in which the wife suffered from posttraumatic stress disorder, there was no evidence that the "abuse was such that it had prevented or is currently preventing Diana from supporting herself as she is currently working and attending school." Br. of Appellant at 40. But Diana testified that during the marriage she had to shield the children from Chase's explosive anger when he was present and that Chase engaged in coercive control that resulted in Diana being responsible for all home care. It was not unreasonable for the trial court to determine that this form of abusive behavior limited Diana's ability to pursue additional education or to obtain employment experience during the marriage and was therefore relevant to whether she was entitled to support.

Accordingly, the trial court did not abuse its discretion in considering the history of domestic violence as permitted under *Foran* and awarding spousal support to Diana.

V. ATTORNEY FEES ON APPEAL

Diana requests attorney fees and costs under RAP 18.1 and RCW 26.09.140.

We have the authority to award fees if requested under RAP 18.1(a). For the purposes of attorney fees in dissolution proceedings, RCW 26.09.140 provides that we may order a party to pay a reasonable amount to the other party for the cost of maintaining or defending any proceedings under chapter 26.09 RCW after considering the financial resources of both parties. When consideration of the financial resources of the parties regarding an award of attorney fees is required, each party is required to file a financial affidavit no later than 10 days prior to the date the case is set for consideration on the merits. RAP 18.1(c).

No. 57931-6-II

This case was set for June 17, 2024. Diana filed her financial affidavit on June 10, less than 10 days prior to the hearing date. Chase did not file a financial affidavit, nor did he move to strike Diana's financial affidavit as untimely.

Because Chase has not objected to Diana's untimely financial affidavit and we may waive time restrictions under RAP 18.8(a) and RAP 1.2(a), we will consider Diana's request for fees and costs despite the late filing of her financial affidavit because the purpose of the rule has been satisfied. Diana's financial affidavit demonstrates financial need. And Chase does not establish that he is unable to pay or challenge Diana's financial affidavit. Accordingly, we grant Diana's request for fees and costs upon her compliance with RAP 18.1(d).

CONCLUSION

We affirm the trial court's final parenting plan, restraining order, child support award, and spousal support. Additionally, we grant Diana's request for fees and costs.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

CRUSER, C.J.

We concur:

LEE, J.

PRICE, J.

30